# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| A.K.A. BRANDS HOLDING CORP.; TF INTELLECTUAL PROPERTY PTY LTD; and CULTURE KINGS USA, INC., | CASE NO.: 2:25-cv-00901-MCS-AS |
| Plaintiffs, | The Honorable Mark C. Scarsi Courtroom 7C |
| v. | **EXPERT REPORT OF STEVEN W. HELLER, ESQ. AND GORDON BELL ADDRESSING COMMISSIONS DUE** |
| ZAHRA BAHARI; THE POWELL COMPANIES, LLC; and WHITNEY MORGAN LLC, | |
| Defendants. | |
| WHITNEY MORGAN LLC AND THE POWELL COMPANIES, LLC, | |
| Counter-Claimants, | |
| v. | |
| A.K.A. BRANDS HOLDING CORP., | |
| Counterclaim-Defendants. | |

I, Steven W. Heller, Esq.,  and Gordon Bell hereby declare as follows:

## I.    INTRODUCTION

1.    We provide this Expert Report Addressing Commissions Due ("Commissions Report") pursuant to the Court's December 29, 2025 Order allowing for Defendants to serve by January 7, 2026, and expert report to (i) address the December 17, 2025, Supplemental Expert Report of Ms. Holt; (ii) address the document(s) produced along with that report; (iii) address Ms. Holt's December 19, 2025, errata letter; (iv) address the testimony Ms. Holt gave at her December 19 deposition concerning the foregoing; and (v) in view of the foregoing, provide a revised computation of the commissions due to Defendants.  Any defined capitalized

1  terms not defined herein shall have the definitions assigned in my prior reports.

2      2.      All facts set forth in this Commissions Report are stated based on our

3  personal knowledge, reference to materials in this case, or set forth on information

4  and belief, and are known or believed to be true.

5      3.      Mr. Heller's qualifications, background, prior cases, and statement of

6  compensation have been provided in his prior reports.

7      4.      Gordon Bell is a Chartered Financial Analyst, with substantial executive

8  experience in both public and private companies, and with non-profit and civic

9  organizations.  As a portfolio manager with billions in assets, Mr. Bell worked

10  directly with hundreds of Fortune 500 CEO's, CFO's, and other top executives to

11  analyze their businesses and make investment decisions over a period of decades.  He

12  holds a Bachelor of Arts, Cum Laude, from Harvard College and a Masters of

13  Business Administration from the Harvard Graduate School of Business with a

14  concentration in finance.  Mr. Bell is currently the CEO of Urbanelite Collective

15  LLC, a company committed to innovation, operational excellence, and long-term

16  success in the apparel space. ███████████████████████████. Mr.

17  Bell's CV is attached as Exhibit 1.  Mr. Bell has authored no publications in the

18  previous 10 years, he has not testified as an expert at trial or by deposition in the

19  previous 4 years, and he is not being compensated for his study or testimony in this

20  case.

21      5.      In addition to the materials previously referenced as relied upon in the

22  Opening Expert Report of Steven W. Heller, Esq. ("Heller Opening Report") and the

23  Supplemental Opening Expert Report of Steven W. Heller, Esq. ("Heller

24  Supplemental Opening Report"), we have also reviewed (i) the Rebuttal Expert

25  Report of Krista F. Holt dated December 8, 2025, (ii) the Supplemental Expert Report

26  of Krista F. Holt dated December 17, 2025, and (iii) Ms. Holt's "Errata Letter" dated

27  December 19, 2025.

28      6.      In both Mr. Heller's Opening Report and Supplemental Opening Report,

among other things, Mr. Heller provided opinions on, among other things, the commissions due to Defendant/Counterclaimant Whitney Morgan ("WM") under the 2023 Consulting Agreement, assuming that WM prevails on its claim that aka Brands breached its obligation to pay commissions for wholesale orders by Introduced Customers under the 2023 Consulting Agreement.

7.     As set forth in Mr. Heller's Opening Report, WM contends it is owed commissions for aka Brands and CKUS sales to at least four customers whom they contend are "Introduced Customers" under the 2023 Consulting Agreement: Nordstrom, T.J. Maxx (Canada), JD Sports/DTLR, and Dillards.  Mr. Heller's prior Reports assumed that that these customers are "Introduced Customers" based in the definitions in the 2023 Consulting Agreement (which he also notes in his prior reports is the same definitions in the 2024 Draft Agreement except for the correction of a typo).  In this Commissions Report, Messrs. Heller and Bell make the same assumptions.

## II.     MS. HOLT'S REBUTTAL AND SUPPLEMENTAL EXPERT REPORTS

8.     Ms. Holt's December 8, 2025 Rebuttal Report purports to compute commissions owed to Whitney Morgan under the 2023 Independent Sales Consulting Agreement ("2023 Agreement") for the following retailers assuming those retailers were "Introduced Customers" under the 2023 Agreement:  Nordstrom "Wholesale" (Petal & Pup and Princess Polly), Dillards, DTLR (Loiter and mnml), Nordstrom Rack, and TJX (Canada).  Holt Rebuttal Rept., at 90-104 and Exhibits 2.1-2.7.  In her deposition, Ms. Holt confirmed that she relied on the same spreadsheets produced by aka's counsel that Heller examined and relied upon in the Heller Supplemental Opening Report as follows:

- Nordstrom Wholesale (Petal & Pup):  AKA0051572
- Nordstrom Wholesale (Princess Poly):  AKA0051573
- Dillards:  AKA0051572

1          • DTLR (Loiter):  AKA0051577

2          • DTLR (mnml): AKA0051578

3          • Nordstrom Rack:  AKA0051572

4          • TJX (Canada): AKA0051575

5     Holt Tr. (Rough) at 142-143.  Aside from these spreadsheets, Ms. Holt also testified

6     that she relied on two discussions with John Gonneville, aka's Vice President of

7     Strategy and M&A. Holt Tr. (Rough) at 120-123.  Ms. Holt confirmed that she relied

8     on no other information in preparing her computations of commissions due.  *Id*.

9          9.     As set forth in Exhibits 2.1 through 2.7, Ms. Holt computes the

10    commissions due under the 2023 Agreement (assuming the above retailers and

11    Introduced Customers) as follows:



19         10.    In Ms. Holt's Supplemental Report, she states that the information

20    provided in the aka-produced spreadsheets are sufficient to compute the Sales

21    Commission owed for Introduced Customers on Commissionable Wholesale Orders

22    under the 2023 Agreement, including Net Sales and the Commission Rate as defined

23    in the 2023 Agreement. Holt Supplemental Report at 9-21.  However, for the reasons

24    set forth in detail in Mr. Heller's prior reports, and as discussed further below, this is

25    simply not accurate.

26         11.    As Mr. Heller covered previously and as we discuss in detail again

27    below, the Sales Commissions in this case are based on a sliding scale formula that

28

1  requires specific cost of goods sold and sales data on an invoice by invoice basis.[1]

2      12.    Simply put, Plaintiffs have not provided the information necessary to

3  calculate the "gross margin" in order to determine the applicable commission rate or

4  the proper sales data and specifically defined deductions to determine the "Net Sales"

5  upon which the commission would be calculated.

6  **III.    HOLT'S REBUTTAL AND SUPPLEMENTAL REPORTS FAILS TO**

7  **ACCURATELY COMPUTE THE SALES COMMISSIONS OWED**

8  **UNDER THE 2023 AGREEMENT**

9      **A.    Computation Of Commissions Under The 2023 Agreement**

10      13.    The 2023 Agreement provides a formula for computing Sales

11  Commissions owed for Introduced Customers on Commissionable Wholesale Orders.

12  The inputs to the formula set forth in the 2023 Agreement in four defined terms.

13  However, Ms. Holt's Rebuttal and Supplemental Reports largely ignore the

14  definitions for the formula inputs.

15      14.    The 2023 Agreement provides that "a.k.a. shall pay a Sales Commission

16  on any wholesale orders by Introduced Customers that are fulfilled during the Term

17  and Survival Period, as defined below ('Commissionable Wholesale Orders')."  The

18  2023 Agreement then provides that the "Sales Commission Rate payable on Net Sales

19  for wholesale orders solicited by WM [sic] defined in Exhibit A."  Under

20  "Commission Payment Terms," the 2023 Agreement provides that "a.k.a. agrees to

21  pay any Sales Commissions owed to WM within thirty (30) calendar days following

22  the last day of the month in which a.k.a. ships product to a customer under the

23

24  ───────────────
[1]  Under the 2023 Agreement, the commissions due to WM were to be computed by

25  the following formula:  "3% plus 1/3% for each additional 100 basis points of gross margin above 30%, up to a Maximum Commission Rate of 18% at 75% Gross

26  Margin and above." TPC-WM-0000209. "Gross Margin" was defined as "Gross Profit divided by Net Sales." *Id.* "Net Sales" was defined as "[t]he total value of the

27  purchase order, not including tariffs/GST collected by a.k.a. for remittance to the applicable government body, less provision for damages and/or returns." *Id.* "Gross

28  Profit" was defined as "Net Sales less cost of goods including freight, tagging, and packaging

corresponding customer contract/purchase order." This plainly means that aka must pay "Sales Commissions" on each purchase order received (i.e., on a purchase order by purchase order basis, not on a cumulative time period basis such as a monthly, quarterly, or yearly basis).

15.    Exhibit A sets forth a clear and detailed definitions of the "Sliding Scale Commission Rate" under which the Sales Commission owed for each purchase order must be computed. Under Exhibit A, the "Commission Rate" is calculated as follows:

- **Minimum Commission Rate:** 3% reserved for orders with a Gross Margin of 30% or below.
- **Variable Commission Rate:** 3% plus 1/3% for each additional 100 basis points of gross margin above 30%, up to a Maximum Commission Rate of 18% at 75% Gross Margin and above.

Exhibit A provides the following definitions for each of the terms used in the rate formula:

- **Gross Margin:** Gross Profit divided by Net Sales.
- **Net Sales:**  The total value of the purchase order, not including tariffs/GST collected by a.k.a. for remittance to the applicable government body, less provision for damages and/or returns.
- **Gross Profit:** Net Sales less cost of goods, including freight, tagging, and packaging.
- **Commission Rate:** The rate payable to WM, which is to be multiplied by Net Sales.

16.    One of key items here is the *actual* "cost of goods" and then specifically allowing fright, tagging and packaging to be included in the cost of goods calculation.

17.    These definitions are in accordance with Generally Accepted Accounting Principles (GAAP). Under GAAP standards, gross profits are defined as total revenues from sales less costs of goods sold ("COGS").

18.    The COGS are the direct costs attributable to the production of the goods sold and are generally calculated at the "landed duty paid" cost of the merchandise when produced by a third party and imported (as we generally have here) or specific cost elements, such as (i) raw materials, (ii) direct labor costs, and (iii) manufacturing overhead directly tied to production, when manufactured directly.  In both scenarios, COGS *does not include* the following:

- *Operating Expenses*: Costs not directly tied to production, such as:
  - Selling, general, and administrative expenses (SG&A)
  - Marketing and advertising costs
  - Research and development expenses
- *Non-Operating Income/Expenses*: Items not related to core business operations, such as:
  - Interest income or expense
  - Gains or losses from asset sales
- *Taxes*: Income taxes are not included in gross profit calculations.

19.    In this case, accurate COGS information is necessary to calculate the Gross Profit and the Gross Margins in order to arrive at the applicable Commission Rate under the 2023 Agreement.

**B.    Information Requested in Discovery for Computing Commissions Due Under the 2023 Agreement**

20.    During discovery, Defendants served the following Interrogatory No. 11 to aka and CKUS:

Identify, on a quarterly basis, all sales of Subject Branded-goods You made to each Subject Customer from November 2020 to the present, including by identifying, **for each Subject Customer**, the specific products You sold (e.g., by SKU) to the Subject Customer**, the Subject Brands that relate to each such product**, the quantities of each such product You sold to the Subject Customer, the prices the

Subject Customer paid for each such product, **the costs You incurred in connection with the sale of each such product, the profits You earned from the sale of each such product**, the sales model You employed for the sale of each such product (e.g., wholesale, dropship, marketplace), and the channels through which the Subject Customer ultimately made the products available to consumers (e.g., online, in-store, etc.). (Emphasis added).

21.    Interrogatory No. 11 does not request "summaries," "aggregates," or "financial statements." It does however require information that includes the "specific products" sold to each Subject Customer, the "quantities" of each such product sold for each of the "Subject Brands", the prices the Subject Customer paid, and "the costs…incurred in connection with the sale of each such product…"

22.    On November 24, 2025, in amended responses (served after the Court ordered Plaintiffs to provide complete responses), aka and CKUS provided 11 Excel spreadsheets with production numbers AKA0051566-AKA0051576 (referred to as 1566-1576). On December 8, 2025, aka and CKUS provided two more Excel Spreadsheets with production numbers AKA0051577-AKA0051578 (referred to as 1577-1578).

**C.    Ms. Holt's Computations are Unreliable Because the Spreadsheets Produced Are Insufficient to Compute Commissions Due Under the 2023 Agreement**

23.    The spreadsheets that aka and CKUS produced in response to Interrogatory No. 11 are the same spreadsheets that Ms. Holt used to compute Sales Commission owed.

24.    Those spreadsheets are insufficient to compute commission due under the 2023 Agreement. Some of the reasons that the spreadsheets are insufficient to compute commission due under the 2023 Agreement are discussed in the Heller Supplemental Report. Other reasons are discussed below. Ms. Holt's reliance on the

same incomplete spreadsheets to compute commissions due under the 2023 Agreement makes her computations in Exhibits 2.1 to 2.7 of her Supplemental Report unreliable.

25.    First, the spreadsheets do not provide information needed to determine "Net Sales" under the 2023 Agreement.  Ms. Holt testified in her December 19, 2025 deposition that certain spreadsheets (e.g., 1572 and 1573), contain a column labeled "Net Sales" and that the figures in the "Net Sales" column equaled "the total value of the purchase order." She further testified that this definition was provided to her by Mr. Gonneville - and that she agreed with it.

26.    That assertion is incorrect.  Under both the 2023 Agreement (and consistent with the GAAP standards), Net Sales are the "total value of the purchase order, excluding tariffs/GST collected for remittance to a government authority and less provisions for damages and/or returns." Except for the TJX Canada spreadsheet (1575), no spreadsheet identifies any purchase order.  Moreover, no spreadsheet (even the TJX Canada spreadsheet) identifies the "total value of the purchase order, the tariffs/GST collected for remittance to a government authority, or the amount of any damages or returned items.  Indeed, none of the spreadsheets identify any of the particular items sold under any purchase order.  Without this information, Net Sales as defined in the 2023 Agreement cannot be determined or verified.

27.    Second, the spreadsheets do not provide information needed to determine "Gross Margin" under the 2023 Agreement.  Ms. Holt's Supplemental Report at pages 11-12 states as follows:   "Based on discussions with a.k.a. Brands personnel, AKA0051572 and AKA0051573 contain the Nordstrom wholesale sales and gross margin data, including data for Quarter 4 of 2024, for Princess Polly and Petal & Pup [sufficient] to calculate commissions.]"  But as discussed above, none of the spreadsheets have information needed to determine or verify Net Sales as defined in the 2023 Agreement.  Moreover, none of the spreadsheets provide the purchase order information, the brands sold under any purchase order, the total value of any purchase

order, or the COGS as defined in the 2023 Agreement from which the Gross Profits could be determined (i.e., the direct costs attributable to the production of the goods sold under each purchase order, including freight, tagging, and packaging).

28.     For example, both AKA0051572 and AKA0051573 present quarterly aggregated figures labeled "Gross Sales" and "Net sales." They do not present the individual purchase order values as required by the 2023 Agreement.  From an accounting standpoint, quarterly Net Sales totals are not equivalent to "the total value of the purchase order".

29.     This deviation from the contract language can have a material impact on the calculation of the commissions.  Specifically, the 2023 Agreement defines Gross Profits as "Net Sales less cost of goods, including freight, tagging, and packaging." In contrast, spreadsheets 1572 and 1573 contains fields for, among other things:

- "Product Cost"  (unclear how this relates to costs of goods).
- "Inbound Freight" (unclear if this "freight" under the 2023 Agreement).
- "Import Duties" (Import duties are not applied to the cost of goods to determine the Gross Margin in the 2023 Agreement).
- "Cost of Sales" subtotal (this is not a defined term in the 2023 Agreement or in the spreadsheets).
- Other Expenses (this includes items such as "distribution center costs" which are outside the 2023 Agreement).

30.     Ms. Holt admitted in her deposition that she did not know what many of these items were or how they were calculated.  Nor could she match these items with terms defined in the 2023 Agreement for computing Sales Commissions owed. Accordingly, Ms. Holt's use of the spreadsheet figures creates a material change in the Gross Margin percentages under the 2023 Agreement that are required to accurately compute Sales Commissions owed.

31.     In fact, Ms. Holt relies on admittedly fictitious data provided by aka and

Mr. Gonneville.  At page 16 of her Supplemental Report, Ms. Holt states that "a.k.a. Brands personnel" who she identified as Mr. Gonneville in her deposition, confirmed that the spreadsheet document labeled "Mmnml – DTLR – Revised.xlsx" (which has production number AKA0051578) "contains wholesale and gross margins data to calculate commissions for DTLR mnml sales."  On the same page, Ms. Holt disagreed with Mr. Heller's statement in his Supplemental Report that the aka-produced spreadsheet AKA 00051574 contains "missing or insufficient data . . . needed to calculate margins and commissions for sales to DTLR."

32.    Apparently, Ms. Holt overlooked text boxes imbedded into both AKA0051574 and AKA0051578.  In both spreadsheets, aka included notes admitting that the entries for "Pross Margin" are an "estimate," stating "***Estimate; financials not currently available***" (emphasis added), as shown below.

EXPERT REPORT OF STEVEN HELLER AND GORDON BELL

33.     While Plaintiffs acknowledge that "Product Margin" is not a real number, Ms. Holt gives no support for how or why this estimate is calculated.

34.     Further, as discussed above, the Commission Rate in the 2023 Agreement is determined by Gross Margin thresholds, including (i) a minimum floor, and (ii) incremental increases tied to margin levels. However, Ms. Holt's computations in Exhibits 2.1-2.7 are based on quarterly aggregations.  This aggregation conflicts with the purchase order-based computations required in the 2023 Agreement for the following reasons: (a) it blends transactions with different Gross Margins, (b) it masks when thresholds are crossed, and (c) it produces an average margin that does not correspond to the margin on any specific Purchase Order.

35.     From a damages-calculation standpoint, averages cannot be substituted for purchase order-level inputs when the formula is non-linear.  A commission scale is "non-linear" when commissions ***do not increase in direct proportion to sales volume or revenue***.  In other words, a 2× increase in sales does ***not*** produce a 2× increase in commissions.  The 2023 Agreement uses a non-linear commission structure.  Ms. Holt's use of quarterly averages rather than purchase order-level inputs can dramatically affect the commission owed.  To illustrate, assume that a large

EXPERT REPORT OF STEVEN HELLER AND GORDON BELL

purchase order in the quarter has a Gross Margin of ≥75%, which would have earned an 18% commission. Also assume that many other smaller purchase orders in the same quarter has much smaller Gross Margins of less than 3%. In that case, the "blended quarter margin" would be substantially reduced by other low-margin purchase orders (which collectively may have accounted for a much smaller percentage of the actual number of articles sold in the quarter), causing the quarter-level rate to drop well below 10%, thereby substantially reducing the Sales Commission owed.

36.    Ms. Holt testified in her deposition that the term "product cost," which appears in several of the spreadsheets, represents the "cost of goods." However, Ms. Holt admitted that she did not know what was included in that same "cost of goods" definition. In fact, Ms. Holt admitted that the figures she was referencing were aggregated summaries, and not purchase-order based. Accordingly, such data cannot possibly support a conclusive calculation of the non-linear commission structure set forth in the 2023 Agreement. For this reason alone, the quarterly data provided in the spreadsheets prevents WM from accurately knowing the applicable commission rates or the actual commissions owed and makes Holt's computations entirely unreliable and likely incorrect.

37.    Ms. Holt's computations are also methodologically unsupported from an accounting standpoint. Under accepted accounting standards, oral explanations cannot replace missing data. Further, an accounting professionals must be able to recalculate results directly from the documents. Here, the supporting data is not provided and some of the spreadsheets are simply screen shots of other excel document pages where an examination cannot even verify the formulas used to make the calculations, or what other rows or columns was included or excluded. (See for example AKA 0051569 reports for Nordstroms and Dillards).

38.    Finally, if a calculation requires assumptions supplied outside the documents, the documents are insufficient. In fact, Ms. Holt admitted in deposition

that the spreadsheets alone were insufficient to compute the Sales Commissions owed in this case as, instead, Ms. Holt needed to rely on "discussions with a.k.a. Brands personnel." While Ms. Holt admitted that those "discussions" consisted of two conversations with Mr. Gonneville, Ms. Holt did nothing to verify in any documents (such as the purchase orders) whether the information Mr. Gonneville provided was accurate. Accordingly, Ms. Holt cannot establish that her Sales Commission calculations are correct or accurate.

39.    As explained previously, below is the information that is needed to accurately determine the Sales Commissions owed to WM under the 2023 Agreement:

**A. Purchase Orders**:

1) Customer wholesale purchase orders issued to any a.k.a. Brand from:
   • Nordstrom (including Nordstrom Rack)
   • TJX (U.S. and Canada)
   • Dillard's
   • JD Sports
   • DTLR

2) All invoices issued by any a.k.a. Brand to the above retailers for such purchase orders.

3) Each purchase order in invoice in 1 and 2 above should include:
   • Customer name
   • Brand name
   • SKU (including color and size)
   • Quantities and prices
   • Discounts and reductions, including any pass through tariffs
   • Damages and returns
   • Purchase order issue date and cancellation date

• Ship date

**B. Purchase Orders from aka Brands to Factories**

• All factory purchase orders issued by a.k.a. Brands to factories that correspond to retailer customer purchase orders.

• Factory invoices to aka, including shipment dates.

• Bank records documenting corresponding payments by aka to factories.

• Cost-sheets and bills of materials ("BOMs")

• Invoices and bank records, including from customs, warehouses, and trucking.

• Freight forwarder invoices and payments

40.     Finally, certain wholesale sales information remains missing as follows:

a. **MNML sales to Nordstrom and Nordstrom Rack.**
Ms. Holt testified that MNML does not sell wholesale to Nordstrom based on testimony from Nordstrom merchant Amelia Davis. However, public reporting states that MNML sells to Nordstrom on wholesale.  See
https://finance.yahoo.com/news/mnml-fine-tunes-assortment-revenue-120500700.html

b. **Princess Polly sales to Nordstrom Rack.**
Ms. Holt testified she "confirmed" all sales were produced. However, numerous Princess Polly styles remain listed on the Nordstrom Rack website.  See
https://www.nordstromrack.com/search?origin=keywordsearch&keyword=princess%20polly

c. **JD Sports sales for MNML and LOITER**.
Ms. Holt claimed JD Sports sales were excluded because JD Sports is an international customer. However, nothing in the 2023

1              Agreement excludes international customers from being

2              Introduced Customers and Interrogatory No. 11 required

3              production of all such sales.

4  Additionally, aka has not provided sales and purchase Orders for Q4 2025.

5      41.    The requirement for the information needed to compute Sales

6  Commissions owed extends through the end of the Survival Period under the 2023

7  Agreement.

8  **IV.    RANGE OF COMMISSIONS OWED UNDER HOLT'S ASSUMPTIONS**

9      42.    For the reasons discussed above, the Sales Commissions owed under the

10  2023 Agreement cannot be accurately computed based on the information provided.

11      43.    In her deposition, Ms. Holt testified that Mr. Gonneville, in one or two

12  discussions, confirmed during that certain spreadsheets do not reflect any

13  commissionable wholesale sales.  According to Holt/Gonneville, those spreadsheets

14  are as follow:

15          a.  AKA0051567 (Macy's marketplace)

16          b.  AKA0051568 (Macy's marketplace)

17          c.  AKA0051569 (Nordstrom Rack wholesale but duplicate of 1572)

18          d.  AKA0051570 (Nordstrom Petal & Pub wholesale but duplicate of

19              1572)

20      44.    Without the information described above, we cannot determine whether

21  Mr. Gonneville's alleged representations to Ms. Holt are accurate.  If they are, then

22  the ███████████████████████████████████████████████

23  ███████████████████████████████████. Again, this number cannot be

24  confirmed as Net Sales as defined in the 2023 Agreement for the reasons discussed.

25      45.    ████████████████████████████████████████

26  ███████  Sales Commissions cannot be calculated under the sliding scale formula

27  because aka has failed to provide the information necessary to determine Gross

28  Margin.  As explained, under the 2023 Agreement's sliding scale, the Commission

Rate ranges between 3% and 18% depending on the Gross Margin achieved under each purchase order.  Accordingly, █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

## V.    RESERVATION

46.    We reserve the right to supplement and/or amend this Report as more information becomes available.


We declare under penalty of perjury that the foregoing is true and correct.

Dated: 1/7/26                    By: _____
                                      Steven W. Heller, Esq.


Dated: 1/7/26                    By: _____
                                      Gordon Bell, MBA, CFA

3155751

# EXHIBIT 1

**GORDON PHILIP BELL, CFA**

███████████████

**EXECUTIVE SUMMARY**

Financial professional and expert by education and training.  Gained experience at the top educational and financial institutions.  Chartered Financial Analyst, Wall Street's top investment credential. C Suite Executive and Board Director with a proven track record of success, measured by billions of dollars of deals, assets under management and corporate  leadership.  Leadership experience and network span multiple industries, civic leadership in New York City, the nation's premier foreign affairs think tank and multiple non-profit organizations.

**QUALIFICATIONS**

- Private Equity at Prudential
- Director of Finance, Portfolio Manager and Partner at Utendahl Capital Partners, an offshoot of Merrill Lynch
- Client and Portfolio Management  at JP Morgan
- Portfolio Management at Citigroup and Clearbridge - $7Bn in assets under management
- Non Profit leadership at Bed-Stuy Restoration Corporation, started by Bobby Kennedy
- Pitched, won and executed Restoration's largest real estate acquisition, a public to private acquisition of 2,600 NYCHA units with partners Arker and Omni
- Led multiple deals for Federal Government, Resolution Trust Corp, resulting in sales of over $1B worth of real estate in multiple markets, originating $250M Fannie Mae mortgage securitizations, and trading of mortgage-backed securities
- Experience leading New York City's New Market Tax Credit efforts, and New Rochelle Industrial Development Agency as Vice Chair and Secretary, to help develop and green light $4B RXR Master Redevelopment Plan

**EDUCATION**

| | | |
|---|---|---|
| Boston | **HARVARD GRADUATE SCHOOL OF BUSINESS** | *Master of Business Administration* |
| Mexico City | **UNIVERSITY OF MEXICO (UNAM)** | *Rotary International Fellow* |
| Cambridge | **HARVARD COLLEGE** | *A.B. cum laude* |
| New York | **CHARTERED FINANCIAL ANALYST** | *Completed in three years* |

**EXPERIENCE**

**2024 - Pres**
***New York***
**Urbanelite Collective, LLC.**
**CEO**
A hands-on leader committed to innovation, operational excellence, and long-term success in the apparel space.

**2022 - 2024**
***New York***
**Shinda Management Corporation**
**COO**
Extensive experience in management, overseeing daily operations, optimizing efficiencies, and driving sustainable growth.  Positioned 300 employees and 4,000 units of housing for growth and superior economic performance.

**2011- 2023**
***New York***
**BEDFORD STUYVESANT RESTORATION CORPORATION**
***Chief Strategy and Business Officer, EVP Strategy and Business Development***
- Continue the legacy of Bobby Kennedy by engaging with city, state and federal programs to increase prosperity of under resourced New Yorkers

Gordon Bell

- Manage and execute real estate development projects as developer and as partner with other nonprofits, local developers, and investors such as Chase and Goldman Sachs
- Develop strategic plan and financing options, maintain compliance, report to board
- Lead multiple Restoration business efforts, which house up to 95 employees across multiple teams, including Business Center and Real Estate

**2005 - Pres**    **LEGACY GROWTH PARTNERS, LLC.**
*New York*     *Principal*
    Raise investment capital, source, structure and close investments including ground up real estate, and taught the Harvard Case Study of project at Harvard multiple years

**1999-2008**    **CITIGROUP ASSET MANAGEMENT, LEGG MASON, CLEARBRIDGE ADVISORS**
*New York*     *Portfolio Manager*
- Managed $7 Billion Large Cap Growth, Institutional/Mutual Fund/Private Client assets
- Designed and taught portfolio management classes to Investment Bankers and Brokers
- Developed proprietary research in multiple industries, including healthcare and technology
- Spokesperson in US and abroad on various investment themes, speaking tour in US major markets with Harvard's Henry (Skip) Gates and raised over $1Bn investment capital

**1997-1998**    **JP MORGAN**
*New York*     *Vice President, Team Leader/Client Advisor for Private Bank*
    Designed and implemented JP Morgan's marketing strategy for 35 elite clients, whose assets exceeded $1.2B, while coordinating the efforts of brokers, portfolio managers, attorneys

**1993-1997**    **UTENDAHL CAPITAL PARTNERS, L.P./MANAGEMENT, L.P.**
*New York*     *Director of Finance, Principal, Portfolio Manager*
- Founding partner of Asset Management and helped raise investment capital of $400M
- Founding executive of the Financial Advisory/Corporate Finance division that developed franchise finance business, with customers including PepsiCo and Franchise Finance Corporation of America

**1990-1993**    **PRUDENTIAL CAPITAL CORPORATION (Private Debt and Equity)**
*Newark*     *Business Developer*
    Primary relationship manager that identified and closed investments for Prudential's $40 Billion private placement portfolio and monetized assets through sales.

**<u>NON PROFIT and CIVIC</u>**

**New York Real Estate Chamber Board** 2012-Present.  Founding **Chairman,** assembled leadership team of chamber, comprising leading African American, Latino and Women owned real estate firms in US and NY area.  Raised funding for and hosted inaugural conference at Columbia University.  Negotiated $20M NYC investment fund with Mayor and NYC Commissioners, November 2015.  **Secretary** April 2016-present.

**Council on Foreign Relations** 1993 – Present. Voted lifetime member in 1998.  Convener and participant in think tank sessions, meetings with heads of state, US government, business and media.

**New York City EDC, New Markets Tax Credit Advisory Board** 2014-2023. Reworked the evaluation system to rank impact of projects and awarded approx. $50M NMTC's annually.

2

Gordon Bell

**Delivering Good** 2021 - 2024, Nominations, Finance and Blue Ribbon Task force committee to devise a plan for Delivering Good's $200M/yr impact to provide clothing and supplies to disaster victims and the impoverished. Develop strategies to interact and support DG's over 800 local partners in the US and abroad.

**Ralph Lauren Cancer Center** 2004-2019. Longest serving Board Director. **Chairman** Oversaw $2.2M hospital addition, oversaw committees, recruited board members, recruited and hired senior executives, awarded incentive competition. **Treasurer** Oversaw budget, compliance and audit. Planned expansion in coordination with the Dormitory Authority of the State of New York. **Secretary** Merged the hospital into Memorial Sloan Kettering Cancer Center.

**Industrial Development Agency of New Rochelle, NY Board** 2006-2017. **Vice Chair** 2013-2015, **Secretary** 2015-2017. City Official. Determined policy and awarded tax incentives to attract business and development. Developed and green lighted $4Bn RXR Master Development Plan. Oversee city staff, budget and transactions.

**Literacy Partners, Inc. Board** 1996-2010. **Treasurer** 1999-2002. Oversaw budget, compliance and audit. Recruited new board members. Finance committee, board nomination committee. Established initiatives to increase productivity. Coordinated strategy with community groups to increase the number of students by a factor of 10.

**North General Hospital** 2003-2007. **Board Member** North General Diagnostic & Treatment Center: **Chairman** 2006-2007, Finance and Operations committees. Restructured emergency room/ambulance facilities to improve throughput. Recruited new board members. Helped establish annual dinner, annual golf outing, corporate sponsorships. Negotiated with NY State officials to gain strategic and financial support.

## PRESENTATIONS
- Citigroup—designed and taught Modern Portfolio Management Theory and Practice modules to investment bankers; and frequent speaker on investment topics in the US and abroad
- Council on Foreign Relations—member and convener
- Opal Investment Conference, Dubai UAE—Presenter and Panelist
- New York Real Estate Chamber— Opening address and Conference Host, at Columbia University, Google NY Headquarters, Harvard Club of New York
- Gateway Business Improvement District (Brooklyn, NY)—Convener and presenter
- Brooklyn Business Center (NYC)—Convener and presenter
- New Rochelle, NY IDA—board member, officer and speaker at televised meetings

## SELECTED ACCOMPLISHMENTS
- Harvard Business School AAA Board, Determine organization strategy and seek solutions for developing and sustaining urban businesses
- Distinguished Trustee Award from NY Hospital Fund for work at Ralph Lauren Cancer Center and North General Hospital
- Founding Chairman of New York Real Estate Chamber, Received Lifetime Achievement Award at 10th Anniversary

Gordon Bell

- Founding Board Member of the Black Business Collaborative, 2020, to develop and implement strategies to achieve equity for the African American business community
- Named 40 under 40 by the Network Journal
- Board Director, NYC Economic Development Corporation Advisory Board on New Market Tax Credits
- Hosted and MC'd Conferences for the Steve Fund at Morgan Stanley, University of Pennsylvania, and Harvard University, City University of New York, and others